## Elder v. Elder

*Charles W. Wolf*, for plaintiff.

SHEELY, P. J., December 27, 1958—The basic facts in this case are probably sufficient to justify a decree in divorce. The testimony would tend to indicate that defendant wife associated with other men, going out in automobiles with them and having them call at her home in the daytime while plaintiff was at work and in the evening after plaintiff had retired, all of which resulted in plaintiff's home acquiring an unsavory reputation. Defendant, when confronted with these facts, admitted them and indicated that she intended

to do as she pleased and that plaintiff could do as he pleased. There were other acts of defendant which would constitute indignities to the person of plaintiff, but most of the testimony was directed to the points above recited. Several of the problems indicated by the testimony were the effect of the fact that both parties continued to live in the common home and whether there was collusion between them for the purpose of securing a divorce. The fact of continuing to live in the same household would not bar a divorce, but it is a factor to consider in determining whether the mistreatment was really such as to make plaintiff's condition intolerable: Nixon v. Nixon, 329 Pa. 256 (1938).

Unfortunately we cannot base a decree on the record in its present form. In Creager v. Creager, 175, August term, 1957, we said: "General rules of evidence apply in divorce proceedings including the rule prohibiting hearsay testimony," and "The rules prohibiting leading questions and statements of the opinions of witnesses are likewise applicable." In 3 Freedman Law of Marriage and Divorce in Pennsylvania §776, the statement is made: "The use of leading questions has been condemned many times. In some instances, disapproval of the practice has led to the refusal of a divorce; and it has been held that testimony elicited by leading questions is not sufficient basis for a decree." Another important rule in divorce cases is that where incidents are alleged to have occurred in the presence of third persons, they, or at least some of them, should be called as witnesses: Putt v. Putt, 118 Pa. Superior Ct. 74 (1935). See also Cristofaro, 115, August term, 1953; Weigandt v. Weigandt, 84, August term, 1953. Plaintiff has violated all of these rules.

Even more important is the fact that plaintiff's counsel appeared as a witness for him and testified to many material facts in the case. Canon 19 of the Canons of Ethics of the American Bar Association provides that: "When a lawyer is a witness for his client, except as to merely formal matters, . . . he should leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in court in behalf of his client." Pa. R. C. P. 205 provides that: "The canons of Ethics of the American Bar Association, as from time to time existing, shall be and become standards of conduct for attorneys of the court." Rule 222 provides that: "Where an attorney acting as trial counsel in the trial of an action is called as a witness in behalf of a party whom he represents, the court may determine whether such attorney may thereafter continue to act as trial counsel during the remainder of the trial."

Plaintiff's counsel was also an employer of plaintiff and at one time interviewed plaintiff and defendant in his office concerning their marital difficulties. During this interview defendant was questioned about her relations with other men and counsel testified to her admissions and to statements she made concerning her husband and her lack of concern about the consequences. Counsel also testified to the reputation in the community of plaintiff's home caused by the conduct of defendant, to plaintiff's physical condition after he learned of the situation and to the fact that he and another employer of plaintiff told plaintiff that he would have to make his own decision but that after it became known that he knew of the situation both of them felt that they could not employ him if he was going to continue to live with her and put up with it. He also testified that he was satisfied that plaintiff's decision to get a divorce was based on the advice of his

mother and sister and from friends, and that there was no collusion in the case although it was obvious that defendant was hoping that there would be a divorce. He also testified that he discussed with plaintiff the question of his leaving the home but that plaintiff put up with the situation because his younger son wanted to return to the home.

This testimony, in clear violation of the Canons of Ethics, goes to the very heart of the case. It tends to establish the indignities complained of by defendant's admission of the charges made against her, the reputation of the home caused by defendant, the effect of defendant's conduct upon plaintiff's health, the absence of collusion and an explanation of why plaintiff continues to live in the same house as defendant. This latter explanation and the testimony as to the absence of collusion could not have been within the personal knowledge of the witness and must have been secured from plaintiff. It is an understatement to say that this testimony should not have been given by counsel. It should also be noted that the practice of interviewing opposing parties for the purpose of securing admissions is not to be commended.

An example of some of the leading questions appearing in the record is as follows:

"Q. You testified about what was said; what she said on that occasion, and on that occasion she told you that you can do as you damn please. Do you recall?

"A. Yes. I recall that.

"Q. You told her—did you tell her that unless this would all come to an end that you could not put up with it any more and you were going to get a divorce? Is that right?

"A. That's right.

"Q. And she told you to do as you damn please and she hoped you would get one. Is that right?

"A. Yes.

"Q. So there isn't any question from what she said that she hoped you would get a divorce?

"A. That's right. She hopes I would get one.

"Q. Now the Master asks you about whether you agreed or made an agreement with her. You think in your mind again to whom you spoke—the people you talked to and who they were. . . .

"Q. . . . And isn't it as a result of your considering what these people said to you that is the basis of your filing for divorce? Is that right?

"A. That's right.

"Q. As a matter of fact, Mr. Kuhn learned to know an awful lot about what was going on at your house with your wife. Is that right?

"A. That's right.

"Q. In view of the reputation for a whore house or a house of ill repute that she caused and what did Mr. Kuhn tell you as to your employment if you continued to put up with it.

"A. Well, what do you mean? For me he was all for it; that he wouldn't live with a woman like that.

"Q. No, but he got around to telling you that in view of the situation and the reputation as to that situation, that in spite of the fact that his wife was your sister he just had to consider whether he could keep you in his employ. Is that right?

"A. That's right. . . .

"Q. And what did I tell you about your employment with me if you continued to live in a household with her?

"A. Well I wouldn't doubt but what you wouldn't have me around your place."

It is difficult to conceive of a clearer violation of the rule forbidding the use of leading questions.

Furthermore, plaintiff testified to what the neighbors and others told him. None of these persons was called as a witness. He also testified to indignities committed in the presence of others without calling the other persons as witnesses, and to the fact that the town policemen had been observing the house and taking license numbers of persons going there, without calling the policeman as a witness.

We are satisfied that without contradictory testimony by defendant, plaintiff has a valid ground for divorce. We will therefore give him an opportunity to produce his testimony in a proper manner.

And now, December 27, 1958, the record is remitted to the master for further testimony.